311-007 Dustin Kundert to Chris DeGrady, appellants by Tracy A. Robb v. Kellerman Valley Community Hospital at the Lilley by Douglas Field. Ms. Robb? Thank you. Can I please report? Council, Tracy Robb on behalf of Plaintiff Appellants. This case involves a claim against a community care hospital for medical malpractice. The facts of the case are that a mother of a newborn 6-7 week old baby couldn't get a hold of her pediatrician during normal business hours. The baby was clearly ill. She became alarmed. She called the emergency room of the defendant hospital. Somebody whose identity we do not know, a doctor, a nurse, or somebody who presented themselves to this mother as a person with medical knowledge, listened to her explain and describe the symptoms that her baby was exhibiting. They asked certain questions. They answered her questions, and they gave her medical advice. She followed that medical advice, which ultimately resulted in the death of her baby. As pled? As pled. The trial court found that because the plaintiff did not know the identity of the person in the emergency room who gave that medical advice, there was no duty because there was no physician or medical care provider-patient relationship. The plaintiff argues that there absolutely is a duty, that a relationship is established once a medical care provider, a nurse, a doctor, anybody in a position to dispense medical advice gives medical advice, and once the person relies on that medical advice. The medical advice was erroneous. That erroneous medical advice is a breach of the duty. The breach of the duty was one of the proximate cause of that baby's death. As pled. And the major issue before us here is, as I see it, is whether the phone call established a physician-patient, we'll call it hospital, but physician-patient relationship, correct? Correct. Until you have that, the law is there can be no duty, correct? Correct. Correct. And the trial court found, as a matter of law, that there was no duty. This case is before you on a motion to dismiss under Section 2615, which means that the trial court found that there were no facts which supported a claim for medical malpractice. The plaintiff argues there's ample facts to support a claim for medical malpractice. The fact that we don't know the identity of the person who dispensed the medical advice, the name of the person, or whether it was a doctor or nurse, should not preclude this mother from going forward, because it's likely that if the hospital follows appropriate risk management procedures, they know the identity of the person who gave that advice, they know when the call came in, and they should have logged what advice was given. Therefore, there was a duty. They breached the duty. Duty was approximate cost. Do you agree this appears to be a case of first impression in Illinois? Definitely. Have you found cases elsewhere? We have found some cases elsewhere. There's plenty of cases that were cited in our brief. There's cases in many other jurisdictions which have found that a telephone call absolutely on its own establishes a physician-patient relationship if the doctor or nurse dispensed medical advice. Once the doctor has listened to the patient's complaints, concerns, symptoms, and dispenses medical advice, whether they've examined them, talked to them, or, I mean, done anything more than talk to them on the phone, that is sufficient to establish a duty of care to which the physician should be held. How is that physician-patient relationship founded? What do we look at? And how is it related to the facts here? As related to the facts here, the Illinois cases, even without going outside the jurisdiction, Kirk and Reynolds being the two seminal cases, all look to the contact between the physician and the patient. Did the physician, I'm using the physician, the word physician. It could have been a nurse. Either way, for purposes of this argument, I'll stick to using the word physician. Did the physician consent to give the patient advice? Did the patient rely on that advice? There is a case that I think it's Kirk or Reynolds says that the relationship is a consensual relationship between the patient and the physician, where the physician knowingly accepts the patient as his patient or her patient, and the patient knowingly consults the doctor for advice. Once those parties have a meeting of the mind, so to speak, that they're seeking medical information, and medical information or medical advice is transmitted from the doctor to the patient, a physician-patient relationship is established. Once that relationship is established, you have a duty of care that's imposed upon that relationship. Any breach of that duty leads to... How does that square with the concept of when a treating physician calls another physician, and his panelist says, well, you know more about this than I do, and he talks to him on the phone, I've got this patient, and the physician says, well, I think he ought to do X, Y, and Z or whatever, things go south. And they say, well, that looks clear, but it seems to me the physician called that other physician on behalf of the patient to get medical advice, and that physician gives medical advice, and the court says there's no, based on that phone call, there's no physician-client relationship, patient relationship between the consulting physician and the patient because that patient is just not personal enough. I do. What do you think of that? And you're kind of talking about the facts of the Reynolds case, and that is where the physician phoned his colleague, as a colleague, to ask questions. What do you think of this? I have this case. This is the situation. What do you think about this? He didn't, the doctor in Reynolds, the primary defender, physician, didn't ask the patient whether he could consult this doctor. He didn't tell the patient he was going to try to get this other doctor in for a consult or in any way formally connect that patient with that physician. That physician didn't, the consulting physician we'll call him, didn't look at any test results or X-rays or any data related to that patient's condition. He just was talking to a colleague. Much as the way lawyers, I have this case, blah, blah, doesn't mean that we've created an attorney-client relationship by discussing our case with our colleague for maybe some insight. As contrasted with, I think it's the Lenihan case or maybe the Smith case, where a doctor did consult with another doctor, told the patient he was going to consult, called him in on a consult. It was a formal consult. It wasn't just two doctors talking about a specific case. It was the doctor contacting another doctor specifically to come in, consult on the case, and proceed forward in treatment with that case. I think that's the Lenihan case that's also cited. Well, certainly, the law seems to be pretty clear. I would guess that a radiologist or something, you know, who never, ever saw the patient and looks at a film and said, owes a duty to the patient, confidently reconveying. But, I mean, this is a really fascinating case. And so what about a cocktail party? You run into a physician at a cocktail party and say, hey, my kid's at home with a fever. What do you think? Well, give him some Tylenol and give him a cup of baths and see your pediatrician in the morning. Physician-patient relationship been established? I would argue no under Reynolds. I would liken that to Reynolds. That's just somebody that's giving some gratuitous advice. At a cocktail party, not called in as a formal consult, not consulted formally. The facts of this case are somebody in that emergency room answered that telephone, listened to those symptoms, and told that mother what to do. And then, I suppose, the courts are going to think about, and my guess is this case, one way or another, is going to have a Springfield. But the, what are the ramifications? It seems to me that if there's a, if this establishes a physician-patient relationship, then the only answer anybody can give in an emergency room, there's only one, is bring the patient, take it to your local emergency room, get it here, get it somewhere, that there can only be one answer to cover themselves. And that is, I'm not trying to diagnose this kid over the phone or adult or anybody else. Bring, come to the emergency room. I think that is definitely one course of action that many hospitals have taken to reduce their risk. There are several others which are discussed in the brief and appended to a motion where there's nurse triage, there's specific computer programs out there today that walk a nurse through asking questions, yes, no, and it's a matrix of information on computer programs that lead you to a certain answer. And once you get to a certain place, they dispense advice. There's different modes that any hospital can take to reduce the risk without. If you do medical stuff, and obviously if you're here for a while, you know that headache, fever, things like that are the most non-diagnostic symptoms in the world. And to try to diagnose that over the phone because the differential diagnosis is, you know, a stretch from, you know, here to Joliet. And so they, I mean, and is that important? Does it make any difference? But when it seems to me that sometimes the courts try to decide where to put a duty, you know, and in certain places they look at the, you know, ramifications. Did this hospital advertise that they would provide free advice by calling the emergency room or a certain number? The reason I ask that question is in our area there was a 6-2 nurse service advertised by the hospital. Call this number, you'll get advice free of charge. Was there something like that in place here? Well, their website advertises themselves as a community care hospital, open to the community, there to serve the community, and all the numbers are listed. It didn't go as far as saying call and we'll give you free advice or advice free of charge. Was the fact that this advice was requested to be given gratuitously? I mean, obviously she didn't expect to pay for it. She didn't come in to receive it. Does that somehow affect the duty? Much like you're standing at a cocktail party and you talk to a lawyer and you get some advice free of charge. I would say that there's a distinction between those two scenarios. The lawyer at a cocktail party is different than calling the lawyer at his office for gratuitous advice because there is a case law that says once somebody calls you, you're in your office, and you give advice, you've established an attorney-client relationship. Call your office and your secretary gives advice, same attorney-client relationship? I don't know. I haven't contemplated that. That's where this case would go. I would say that, no, because secretaries don't have the same measure of skill and training as, say, a nurse does. So I think seeking advice from a nurse about things within the realm of what nurses do and know and are trained to do is different than you might at a secretary have a high school education and they're really just trained to do. Let me ask you, certainly we can glean from the cases, both here and there, that whether a physician-patient relationship has been established is a fact-sensitive inquiry. Yes. Is there any moment, or to what effect is it, it seems that the allegation that, well, whoever it was, a nurse or doctor spoke to said, by the way, we have neither the personnel nor the equipment to deal with infants here. Does that, did that comment from whoever had it on the phone, does that have any bearing on whether there was a physician-patient-client relationship? No. I thought that particular piece of advice was odd in light of the fact that it followed all of the, you know, dispense Tylenol, give tepid baths, and so on and so forth. Oh, and by the way, don't bring the baby here. We can't take care of him. Well, I would say that you've undertaken care.  And somebody in a rather panicked situation with an infant that's, you know, been sick and is getting sicker and sicker and sicker, notwithstanding all of the things that you've tried to do all day, you know, change them and so forth. So I would say. But I suspect your opponent's going to say not panicked enough to put the child in the car and take him to a hospital. I can't speak to how panicked a certain person gets. I think that that's probably the reason why she didn't know the name of whoever she spoke to or whether it was a doctor or nurse because I think she just assumed that whoever would answer the phone and listen to the symptoms and give advice had the credentials to do so. But in terms of, I don't, I can't speak to that because I don't think that anybody's asked her that question because we haven't gotten that far because we're on a 615 motion. So if nothing else, I'll sit down and let my opponent. Any other questions? No. Thank you, Ms. Brown. Mr. Gisk. Thank you, Mayor. Please, the court and counsel. My name is Douglas Giff. I represent Illinois Valley Community Hospital in this matter. First of all, I want to, it's very honorable to be here, honored to be able to speak before your honors today and I've already heard many of the matters I was going to discuss be answered or requested in terms of your questions. We've got some for you too. I'm sorry. I'm certain you do, your honor. But one of the things I think I need to make sure is clear here is we have to look at this record and it's a fairly limited record because Judge Lanuti took this case right from the get-go and said, you know, we can cut through all of these things because we've got to look at the idea of duty. And that's the only issue he needed to look at in this case. And as the Kirk case said, and it's clear, that's a matter of law and that's why your honors have an opportunity to look at that fresh in terms of making a decision whether Judge Lanuti was right or not. But I have to correct one thing that counsel said. Judge Lanuti never said, well, because it's anonymous, that's why there's no duty. What the judge did say was you're making a phone call to an emergency room. You don't know who you're talking with and you ask a question and the person tells you the following things. And one of the things I'd like to add is while counsel adds in her statement of facts, everything from the Mayo Clinic website to various things about what meningitis and other things are, it's not part of the statement of facts. The statement of facts are the allegations that the court would accept, as Wall stated, sufficiently for it to consider those for the ruling it's going to make. And I would refer your honors to my corrected or at least additional statement of facts because I try to wind them down to those matters that just involve duty. Well, let me ask, but the duty, which is a question of law. Yes. A right, but you can only have a duty correct if there's a physician-patient relationship. I mean, that's the beginning point, right? Absolutely. And there are some cases that say that is a question of fact. Your Honor, I believe that what the case has said, because some of those other ones were 615 cases, were that the facts, even taken in the light best to the plaintiff in this case, do not establish that relationship. Well, I agree that even a fact question can be ruled on as a matter of law. That's correct. But you've got a little... Right. Well, Your Honor, and your honors, the issue here in this case comes down to the fact that rather than cutting it to a very narrow issue of the person asked a question and they were given, quote, unquote, advice, that's not what the cases in Illinois say. If you look, for instance, at the Reynolds case, which has already been listed, the court there specifically stated what we're looking at is what would give rise to a physician-patient relationship. And they said it didn't in Reynolds because the person who was asked, who would have been the physician in that relationship, never conducted any laboratory tests. They never contacted the person again. They had one contact, and that was through the other physician. They never charged a fee. So here we are back to our gratuitous situation. And in Reynolds, the court used those things to determine as a matter of law that there was no physician-patient relationship. On the other hand, the Lenahan case, where they did find this, the court in that case went the opposite way consistently, and found there was a duty saying in that particular case the physician actually provided real hospital services to the plaintiff while they were at the hospital. This was an issue of whether someone who didn't have direct contact with the person still provided services. And they said this person conducted laboratory tests. They reviewed the test results. So they did the kind of things that physicians do when they represent or when they're acting in a physician relationship to the patient. Now, Consell would have you in her brief say, well, just the mere giving of advice establishes that physician relationship, and yet how do we look past the Siwa case, which I cited in my brief, where there the doctor, the court instead said this person was really there to do other things. They were a radiologist that was testing some equipment, but the person actually met with the patient and gave them advice. And the court said giving advice is not the issue. The issue is was he acting in the role of that person's physician at the time it occurred. And I would indicate to your honors that in this case, Judge Looney grabbed this case by the horns, essentially, and says you've alleged all the facts. I have to assume everything you've told me is true. Consell will probably find at some later point that all those facts may not be true if this case went on. But I'm going to take this case right now, that's what Judge Looney said, and said I don't see where there's a duty here under the circumstances you set forth. And your honors, I really need to add one other thing. There's sort of a disagreement in the briefs about the quote, the term special relationship. I don't know if you noticed that in the briefing. Because the Reynolds case, as well as Kirk, talk about the issue of special relationship. Because Consell, a claims counsel, talked about the fact that this child had been born at the hospital and had maybe some other tests some other time, you know, does that create some special relationship? In their reply brief, they said, no, that's not really what we meant. But my purpose of putting it in the brief is to make it clear that the law in Illinois essentially is that when that baby gets discharged from the hospital, the duty of care ends for that child. In other words, each time they go to the hospital is sort of a different relationship that started because they can't control what happens in between. And my position, your honors, is this, that hospitals, especially small community hospitals, or they could be very large ones who represent the community, expect people to come to the emergency room where they sign in, they fill out forms, they answer a series of questions, they get, yeah. If that's the case, then why would they dispense the kind of medical advice that was alleged in this case over the telecom? Your honor, no one will know that or even know whether that happened or not. Well, they might. What? I said, conceivably, they might. It depends on where this case goes. I understand, your honor. But the point here is, is that if we take everything that was said that is true, our position and the cases in Illinois, as I cited, would indicate that there was never a physician-patient relationship in the way that the cases in Illinois have found. Is that simply because it was over the telephone? No, not necessarily. And it was the initial. Right. Most of those things was initial contact. Well, your honor, it wouldn't have had to have been by telephone. It could have been the cocktail party or seeing someone on the street. It's not the fact that it's telephonic. It's the fact that it was not done in an official manner intending to become that patient or for that person to be their patient and give them advice and essentially plan to treat them. And from our standpoint, your honor, all of these are instances where, and with all due respect to the issue of looking at this from a policy standpoint, if your honors would find that this type of case is actionable, then certainly it would result in no hospital ever taking a call from anybody for any reason, because they couldn't prove. They have no means to deny when someone claims anonymously. They don't know who they talked with, but they told them they should do X, Y, Z. And if it's bad enough for a community hospital who might be able to go and find out who was working on certain nights, can you imagine what it would be to other hospitals in Illinois who have hundreds of workers and hundreds of departments with no real way to do that? So I think we have to look at it from that standpoint. I think the Illinois law is clear enough without a decision by this court adopting certain standards that may or may not occur in other states when the path of Illinois cases talk about a real relationship between the parties, between physicians and their patients. Things like charging a fee or giving care, checking tests, ordering tests, reviewing aspects. That's what makes a physician-patient relationship, not answering some questions over the telephone. Is there a meeting of the minds that goes both ways for a physician-patient relationship? The reason I ask the question is at a cocktail party, you're looking at the person, you know who you're talking to. Here we have a telephonic conversation. She didn't even know who she was talking to. Well, Your Honor, that would, I guess, go to the inference of whether she had a right to believe that the person she was talking with knew what they were saying and she relied upon it. At this point, all I can take are the facts that they allege that the person relied upon that and then followed up and did certain other things. But the other side of the coin is one which Judge Lanuti essentially seized on, is if we don't know who the person is, then we're never going to, I mean, that's one of the aspects of why we're never going to know whether they thought they were acting as a doctor, nurse, lab person, whatever it was that they called. It's not whether we know, it's whether she knew. Isn't it? Your Honor is correct that that is one factor, but it is two-sided. It also has to be, by the cases I cited, C-Y is one of them, and also in Reynolds is the doctor also has to have taken the person as their patient. Well, let me ask you this. Is there an argument that by virtue of prescribing medication over the phone, you have taken this person as your patient, that you don't prescribe medication for people that aren't your patients? Well, I believe, Your Honor, that the facts as alleged say that I think you can give them Tylenol, but I have no idea what to give them. Go call a pharmacist. Well, he said the dosage. He said that, you know. Right. And by the way, I understand that more and more that pharmacists are taking a bigger role in that case. And you notice the pharmacist didn't get sued. Sorry. But, nonetheless, he said take Tylenol on the fact that it's a certain thing you have to write a prescription, and Tylenol is an over-the-counter drug, and taking things as planned. You could say, well, you know, sometimes we presume, you know, intent is presumed by your actions. You know, you're presumed to intend the natural consequences of your actions, the criminal law concept. Well, you say if you prescribe medication for somebody and say, but I didn't intend to have a physician-patient relationship with them, then what in the world are you prescribing medication to? And, Your Honor, with all due respect, the other question that was asked, which I can't answer as well, is the fact that they were also allegedly told that we don't treat children here and we don't know what to do, essentially. So I think from our standpoint, Your Honor, this is a case where, because there isn't a specific case just like this in Illinois, it's because people have never brought a case like this before because it's never gotten this far. And if it were, it would be in the same position it is now. It would be challenged at the trial court level and hopefully end at that point. Counsel, you have two minutes. I have nothing further unless there's other questions. Thank you very much. Thank you. Ms. Robbs or Rebelle? Well, first I would just like to address the notion that my opponent brought up, which was the hospital has no way of knowing who calls when and can you imagine what's going to happen in bigger hospitals. That issue goes back to the notion of risk management procedures being instituted in the hospital, noting telephone calls, what time they came in, who took the call, and what happened within that call. That's the way to avoid certain problems and to define the issues in a case like this where maybe the mother panicked, didn't ask, who knows why she doesn't know the identity of the person she didn't know. You can match up the telephone, the time of the telephone call with the telephone log in the emergency room. We didn't have an opportunity to get the emergency room log to see if there is such a thing, to see who it was that talked to her. But one of Mr. Giff's arguments was along that line that the fallout could be that they just said, we simply are not going to talk to anybody over the phone, period. And it is just as the court said when they did the Angus or Reynolds case and say, well, we don't want to discourage people from, physicians from consulting with other physicians on these cases. And so is that a concern? So I understand the risk management thing, but then maybe the fallout is we're not taking any calls. Do not send a call out here to the ER. That might, in fact, be the answer. Or some of the other protocols that I mentioned earlier might be the answer. But there has to be some resolution because people call emergency rooms seeking advice. And if you're calling an emergency room, it's an urgent situation typically. And you're not going to, can I have your name? Can I have your employee badge number? You're not going to know. If we had known and we had named Nurse X as a defendant, I think we would have gotten past 615 and at least gotten to some discovery where we could, both sides could put this together, match these allegations that are in our complaint with some record keeping by the hospital. On the other hand, is it reasonable for people to call an emergency room, get somebody on the phone because they have an urgent situation, and not have that hospital, that doctor, that nurse held to a duty of reasonable care? If you hold, if you follow my opponent's argument, any telephone advice dispensed from an emergency room in a hospital, no duty will attach, there is no duty of care, any advice could be given, and there is no recourse for bad advice. I think that's equally bad. Well, except, don't we go back to, the Illinois law is pretty clear, but before there can be a duty, there's got to be a physician-patient relationship, right? Isn't that the Illinois law? That is the Illinois law, but if you're dispensing advice, the Illinois law put together is pretty clear that once there's, the consensual relationship is predicated on the dispensation of advice, well, the solicitation of advice, the dispensation of advice, and the reliance on that advice. Once those three components are met, then you have a physician-patient relationship. And if I call an emergency room asking about, for some advice regarding one of my children, and I can't rely, there's no safeguard, there's no legal duty for them to respond in a non-negligent way, why would I bother calling? Is there a unified opinion? Well, I mean, obviously, generally when you're calling about your child, you're not thinking about a lawsuit down the road, you're thinking about making your child better. And, I mean, we've got to deal with the case law first. Is it gratuitous versus non-gratuitous? Also, the intent of the parties in creating this relationship is a fascinating, difficult case. Well, I don't think that the answer hinges on whether there's compensation in this particular case. I think in some of the doctors' cases, the consultants, I think that you can look to whether they were compensated as one factor or one piece of evidence that goes to answering the question. But I don't think that that is the linchpin of the answer. I think it's just one piece of the answer. In this situation, you know, you're not going to get billed from an emergency room for calling. That's not customary practice. What if you go to a website? How do you get the symptoms? There is a plethora of information that's available out there about the legal ramifications of giving erroneous medical advice via the web and your own web page, you know, websites designed specifically to give advice. There are those. It's kind of like an online urgent care center. Right. Those. You posed the question to us, why would I call the emergency room if I didn't expect to get advice? Because some people call just to get information. That advice they're going to rely on. They just need information, and they might call another hospital and another hospital and another hospital. If you want medical advice, see a doctor. You see a doctor, you go in. Well, in this particular instance, it's after hours, and her doctor is not available. She's not answering the phone. She's unavailable, and this is where she has hospital privileges, which is the purposes of pleading the previous relationship with the hospital. That's why she chose to call this particular hospital, because her doctor had privileges there and she had had some previous things there. That's what motivated her to call there because she had, you know, in her mind, a relationship. I understand that each admission is a different relationship between a physician and a patient, but from the patient's point of view, you have an ongoing relationship. You go to the same hospital. You go to where your doctor has privileges. That's where you feel comfortable. My time is up. All right. Thank you. Well, thank you both for joining us here this afternoon. This matter will be taken under advisement and a written disposition.